**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Regina M. Rodriguez**

Civil Action No. 1:21-cv-02757-RMR

KEVIN WILLIAMS, JR.,

      Plaintiff,

v.

DR. COLLEEN SONNENTAG,
Dean of Students at the University of Northern Colorado, in her official capacity, et al.,

      Defendants.

---

## ORDER

---

Pending before the Court are Plaintiff Kevin Williams, Jr.'s Second Motion for Temporary Restraining Order and Preliminary Injunction ("Motion for TRO"), ECF No. 29, and Defendants' oral motion for the Court to consider that Plaintiff has not met his burden under Federal Rule of Civil Procedure 65 to demonstrate his entitlement to the extraordinary remedy of a preliminary injunction, *see* ECF No. 32.

For the reasons stated below, Plaintiff's Motion for TRO is GRANTED IN PART, and Defendants' oral motion is DENIED.

## I.      BACKGROUND

Mr. Williams is a twenty-two-year-old University of Northern Colorado ("University") graduate student and football player.  ECF No. 28 ¶¶ 7–8, ECF No. 29 at 2–3; ECF No. 30 at 1.  On the morning of August 12, 2021, a loaded pistol belonging to Mr. Williams

was found in the University's football locker room in his unsecured and unattended backpack, which had been sitting in the locker room for up to five weeks.  ECF No. 28 ¶¶ 11, 14; ECF No. 29 at 3–4; ECF No. 28-1 at 1–2.  Mr. Williams was subsequently suspended from the University.  ECF No. 28 ¶¶ 16–22; ECF No. 29 at 4–6; ECF No. 30 at 1–2.  According to Mr. Williams, "the last time he had seen the weapon was about a week after July 4, 2021, when he used it for recreational shooting practice, and . . . he did not realize it was missing until he was notified on August 12, 2021 that it had been found in the locker room."  ECF No. 29 at 3.

The Dean of Students, Dr. Colleen Sonnentag, is responsible for student disciplinary matters under the University's Student Code of Conduct (the "BEAR Code"). ECF No. 30-1 ¶ 2; *see also* ECF No. 30-5 at 3 (BEAR Code § 3-2-203(3)).  Dr. Sonnentag emailed a letter to Mr. Williams on August 16, 2021 advising him he was alleged to have left a loaded pistol in a locker room on campus, and that, if true, such conduct may violate section 3-2-204(8) of the BEAR Code, regarding "Deadly Weapons Violations."[1]  ECF No. 30-1 ¶ 5; ECF No. 30-6 at 1.  The letter also set a hearing for August 23, 2021.  ECF No. 30-1 ¶ 5; ECF No. 30-6 at 1.  Mr. Williams attended the hearing with Dean Sonnentag. *See* ECF No. 30-1 ¶ 6; ECF No. 28-1 at 1.  At the hearing, Mr. Williams informed Dean Sonnentag that he had a permit to carry a concealed weapon "because of [his] high-risk work environment with at-risk youth in Nebraska," where he is from originally.  ECF No. 28-1 at 1; *see* ECF No. 28 ¶ 10; ECF No. 29 at 3.   Nonetheless, Mr. Williams

---

[1] The BEAR Code provides that "[u]nlawfully carrying, bringing, or being in possession of a deadly weapon (including a firearm whether loaded or unloaded . . . ) on [University] Property" constitutes "Misconduct" under the Code.  ECF No. 30-5 at 8 (BEAR Code § 3-2-204(8)).

acknowledged the pistol found in the locker room belonged to him and that he had made a mistake.  ECF No. 28-1 at 1–2.

On September 15, 2021, Dean Sonnentag issued and delivered to Mr. Williams her written Resolution, finding that he was responsible for a "Deadly Weapons Violation[]" under section 3-2-204(8) of the BEAR Code.  *Id.* at 3; ECF No. 30-1 ¶ 7.  Based upon this finding, Dean Sonnentag suspended Mr. Williams, effective that day through the end of the spring semester of 2022.  ECF No. 28-1 at 3–4.  The Dean also assigned the following outcomes and restrictions on Mr. Williams: a "No Trespass Order" prohibiting him from coming to campus, a gun safety course, a research paper on handgun safety, and a "Return from Suspension Follow Up Meeting."  *Id.* at 4–5.  The Resolution also notified Mr. Williams of his appeal rights under the BEAR Code.  *Id.* at 5.

On September 19, 2021, consistent with the procedure set forth in the BEAR Code, Mr. Williams appealed the Dean's decision to suspend him, arguing that this outcome was "way too harsh," "particularly where [his] conduct was unintentional."  *See* ECF No. 30-2 at 1.  He noted that he had "completed [his] gun safety course" and his "essay on gun safety" and that he "can whole Heartedly attest that [he] ha[d] learned from [his] mistake" and "fe[lt] [he] would better serve the campus community by remaining at [the University] and using [his] platform to educate others about the importance of gun safety." *Id.* at 2–3.  Mr. Williams asked the appeal readers to "please find it in your hearts to forgive me for my mistake."  *Id.* at 3.

On October 7, 2021, the University's appeal readers issued their decision.  The appeal readers noted that they "d[id] not believe that Mr. Williams pose[d] any further risk

to fellow students, faculty, or the [University] community" and that "[i]t is clear that Mr. Williams is a leader on campus, in athletics, and in the [University] community."  ECF No. 28-2 at 2–3.  They concluded that Mr. Williams had engaged in misconduct, but "the sanction of Suspension was too severe" and remanded the case to Dean Sonnentag to consider their "recommendation" of two other possible sanctions for Mr. Williams' misconduct.  *Id.*  One of those sanctions was a research paper that was more focused on safe storage of weapons when not in use, rather than handgun safety, generally.  *See id.* at 3.

One day later, on October 8, 2021, Dean Sonnentag issued her decision on remand, stating that:

> While [she] appreciate[d] the efforts of the appeal readers in this matter, based on all the information available to [her], [she] f[ou]nd that the appeal readers did not provide sufficient support for the proposition that [Mr. Williams'] suspension was inappropriate given the nature of the Misconduct . . . and the appeal readers' findings regarding that Misconduct.

ECF No. 28-3 at 5.  However, Dean Sonnentag adopted the appeal readers' recommendation that Mr. Williams should write a more focused gun storage and safety essay.  *Id.* at 4.  In effect, the same sanctions remained in place, except that Mr. Williams was required to write an additional essay.  *See id.* at 5; ECF No. 28-2 at 3.

On October 13, 2021, Mr. Williams filed a Complaint in this Court for Declaratory and Injunctive Relief, ECF No. 1, against Dr. Colleen Sonnentag, Dean of Students of the University of Northern Colorado, and the individual members of the Board of Trustees of the University of Northern Colorado, in their official capacities.  That same day, Mr. Williams also filed a Motion for Temporary Restraining Order and Preliminary Injunction,

ECF No. 2.  Since then, Mr. Williams has amended his complaint twice in order to replace the individual members of the Board of Trustees with the Board, itself, as a body corporate.  *See* ECF Nos. 21, 23–24, 26–28; *see also* ECF No. 29 at 1 ("Plaintiff has amended his complaint to dismiss the individual members of the Board of Trustees of the University of Colorado and has added the Board as a party.").  Mr. Williams' operative Amended Verified Complaint for Declaratory and Injunctive Relief ("Amended Verified Complaint") was filed on October 20, 2021.  ECF No. 28.  Accordingly, Mr. Williams filed his present Second Motion for Temporary Restraining Order and Preliminary Injunction that same day.  ECF No. 29.  Defendants filed their Response on October 27, 2021.  ECF No. 30.  On October 29, 2021, the Court scheduled a hearing on Mr. Williams' motion ("Motion Hearing"), which took place on November 4, 2021.  *See* ECF Nos. 31–32.  At the Motion Hearing, Defendants made an oral motion for the Court to consider that Mr. Williams had not met his burden under Federal Rule of Civil Procedure 65 to demonstrate his entitlement to the extraordinary remedy of a preliminary injunction.  *See* ECF No. 32. Mr. Williams' motion and Defendants' oral motion are currently pending before the Court.

## II.    LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule."  *Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020) (quoting *United States ex rel.*

*Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888 (10th Cir. 1989)).

> To obtain a preliminary injunction, the movant must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harms that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest.

*Aposhian*, 958 F.3d at 978 (quoting *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007)); *see also Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003).  "It is the movant's burden to establish that each of these four factors tips in his or her favor." *Heideman*, 348 F.3d at 1188–89.

## III.    ANALYSIS

The University invites this Court to review this matter as a challenge to the University's legitimate interest in prohibiting loaded pistols from being left unattended about campus, the general interest in gun safety, or its ability to establish or enforce discipline on campus.  The University devoted significant time at the Motion Hearing as well as in its Response, ECF No. 30, to this argument.  The Tenth Circuit has clearly stated that the University has a legitimate interest in providing a safe environment for students and staff.  *See Butler v. Rio Rancho Pub. Schs. Bd. Educ.*, 341 F.3d 1197, 1201 (10th Cir. 2003).  However, the question presented here is much more limited.  Mr. Williams has challenged the actions of the Dean on substantive and procedural due process grounds.  Thus, this Court must focus its analysis on whether the University afforded Mr. Williams the process that was due to him under the law in its decision to discipline him and the appeal that followed.  For the reasons that follow, the Court finds

that Mr. Williams has demonstrated a substantial likelihood of success on his second and fifth claims for relief that he was denied substantive and procedural due process when the Dean failed to adhere to the conclusions and findings of the appeal readers on remand.  He has also sufficiently established that the other requirements for a preliminary injunction tip in his favor and therefore he is entitled to relief.

### A.    Substantial Likelihood of Success on the Merits

In his operative Amended Verified Complaint, Mr. Williams challenges, on substantive and procedural due process grounds, the University's decision to suspend him and its process for coming to that decision.  *See* ECF No. 28 ¶¶ 32–72.  Pursuant to 42 U.S.C. § 1983, he brings five claims for relief against the University under the Fourteenth Amendment.  *Id.*  First, he claims that he was denied substantive due process because "the regulation on which [his] suspension was based did not actually forbid [his] possession or carrying of the handgun."  *See id.* ¶¶ 33–34.  Second, he claims that he was denied substantive due process because "Dean Sonnentag disregarded the appeal readers' decision" that "suspending [him] was too harsh a penalty" and upheld her decision to suspend him.  *Id.* ¶¶ 39, 45–46.  Third, Mr. Williams claims that "[p]unishment . . . for unknowing possession is not rationally related to any legitimate state interest, and thus violates substantive due process."  *Id.* ¶¶ 50–52.  Fourth, Mr. Williams claims that he was denied procedural due process because he did not have notice that his conduct violated the BEAR Code, which only deems the carrying, bringing, or possession of a gun that is "unlawful[]" to be misconduct, because he had a concealed carry permit and thereby, he argues, possessed the gun lawfully.  *Id.* ¶¶ 57–58.  Fifth,

and finally, Mr. Williams claims that he was denied procedural due process because after "the appeal readers determined that suspending [him] was too harsh a penalty," Dean Sonnentag, one day later, "disregarded the appeal readers' decision and suspended [him]," which, Mr. Williams argues, "unlawfully deprived [him] of his right to appeal provided by [the BEAR Code]." *Id.* ¶¶ 69–71.

The Court finds that Mr. Williams has established a substantial likelihood of success on the merits of his second and fifth claims for relief: that he was denied substantive and procedural due process when Dean Sonnentag's decision on remand did not comport with the findings and conclusions of the appeal readers during the University's appeal procedures.  Because the Court finds a substantial likelihood that Mr. Williams has thus been denied substantive and procedural due process during the course of the appeal procedures established by the University, the Court does not address at this preliminary stage Mr. Williams' other three claims.

### 1.    Procedural Due Process

#### a.    Applicable Law

As both parties acknowledge, the Supreme Court has set forth the minimal procedural due process requirements for students subject to "short suspension[s], not exceeding 10 days" in *Goss v. Lopez*, 419 U.S. 565, 584 (1975).  There, the Supreme Court held that:

> Students facing temporary suspension have interests qualifying for protection of the Due Process Clause, and due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story.

*Goss*, 419 U.S. at 581; *see also id.* at 579 ("[S]tudents facing suspension and the consequent interference with a protected property interest must be given some kind of notice and afforded some kind of hearing."). "The Clause requires at least these rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion from school." *Id.* at 581; *see also* U.S. Const. amend. XIV, § 1. The Supreme Court reasoned that "[t]he risk of error" in school disciplinary proceedings "is not at all trivial, and it should be guarded against if that may be done without prohibitive cost or interference with the educational process." *Goss*, 419 U.S. at 580. In limiting its holding in *Goss* to suspensions of ten days or less, the Supreme Court observed that "[l]onger suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures." *Id.* at 584.

"[T]he Supreme Court has not answered the question of what, if any, additional process is required for a long-term suspension or expulsion." *Watson ex rel. Watson v. Beckel*, 242 F.3d 1237, 1240 (10th Cir. 2001). In *Watson*, the Tenth Circuit discussed what additional process may be required and applied the three-factor balancing test from *Mathews v. Eldridge*, 424 U.S. 319 (1976). *See Watson*, 242 F.3d at 1240 ("The three-factor test from the *Mathews* decision, decided one year after *Goss*, is appropriate for determining when additional procedure is due because the test crystalizes the balancing of student interests against school interests suggested in the *Goss* decision."). The Tenth Circuit described the *Mathews* test as follows:

> Under *Mathews*, a court must balance three factors: (1) the private interest that will be affected by the official action, (2) the probable value, if any, of additional or substitute procedural safeguards, and (3) the government's interest, including the fiscal and administrative burden, that the additional or substitute procedural requirements would entail.

*Id.* at 1240 (citing *Mathews*, 424 U.S. at 334–35).

While "due process does not require the 'wholesale transplantation' of the judicial rules of procedure to administrative hearings," "the 'ultimate balance involves a determination as to when, under our constitutional system, judicial-type procedures must be imposed upon administrative action to assure fairness.'"  *Id.* at 1241 nn.2, 4 (quoting *Mathews*, 424 U.S. at 348).   "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  *Mathews*, 424 U.S. at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

### b.   Discussion

As a preliminary matter, Defendants concede that, for purposes of procedural due process, Mr. Williams has a property interest in his continued enrollment at the University.[2]  *See* ECF No. 30 at 4 (citing *Goss*, 419 U.S. at 576; *Gossett v. Okla. ex rel. Bd. Regents for Langston Univ.*, 245 F.3d 1172, 1181 (10th Cir. 2001)); *see also Mathews*, 424 U.S. at 332 ("Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment.").  Hence, Mr. Williams' entitlement to his continued education is "a property interest which is

---

[2] However, as Defendants note, "[p]articipation in interscholastic athletics is not a constitutionally protected civil right."  *See* ECF No. 30 at 4–5 (citing *Albach v. Odle*, 531 F.2d 983, 984–85 (10th Cir. 1976)).

protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause." *Goss*, 419 U.S. at 576. The question here is whether the University violated Mr. Williams' procedural due process right when it granted him an appeal, but the findings on appeal were rejected on remand.   As stated above, "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews*, 424 U.S. at 333; *see also* U.S. Const. amend. XIV, § 1.

The BEAR Code provides, in part, for the following disciplinary procedure for students who have been alleged to have committed "Misconduct," as defined in the Code: After receiving notification from the Dean, a hearing is set at least three business days later, at which the student may have witnesses present and respond to evidence.  ECF No. 30-5 at 12–13 (BEAR Code § 3-2-208(1), (2), (4)–(5), (9)–(10)).[3]  "After the Hearing is completed, the Dean of Students will issue a written Resolution of the matter," which is "[t]he written decision of the Dean of Students in a Code Due Process proceeding" that "summarizes the matters in issue, states whether a Preponderance of the Evidence supports the proposition that the Responding Party(ies) committed Misconduct and, if so, describes the Outcomes imposed . . . because of the Misconduct."  *Id.* at 6, 13 (BEAR Code §§ 3-2-203(14), 3-2-208(14)).  "If the Responding Party is found to have engaged in Misconduct, the Resolution will describe the Outcome(s) imposed."  *Id.* at 13 (BEAR Code § 3-2-208(15)).   BEAR Code section 3-2-204(8) ("Deadly Weapons Violations")

---

[3] *See also* ECF No. 30-5 at 13 (BEAR Code § 3-2-208(11) providing that "[r]ules of evidence or procedure used in court proceedings do not apply in the Hearing and general considerations of relevancy and fairness will be used by the Dean of Students during the course of the Hearing.").

provides, in relevant part, that "[u]nlawfully carrying, bringing or being in possession of a deadly weapon (including a firearm whether loaded or unloaded . . . ) on [University] Property" "constitutes Misconduct." *Id.* at 7–8 (BEAR Code § 3-2-204(8)).

The BEAR Code further provides for the following "Appeal Procedures." *Id.* at 14 (BEAR Code § 3-2-210).  "If a Responding Party is determined to have committed Misconduct, the Responding Party may file a written appeal of the Resolution's determination of Misconduct and/or the Outcome(s) imposed" by "appeal[ing] the Resolution on one or more of the following bases":  First, denial of "Code Due Process," which is defined in the BEAR Code as "[r]eceipt of a Notification and the opportunity for a Hearing with the Dean of Students and to respond to the alleged Code violation(s)"; second, "[e]xistence of new evidence" that "was not available at the time of the Hearing"; and third, that "[t]he Outcome(s) were inappropriate given the nature of the Misconduct that was committed (but only to the extent that the Responding Party is suspended or expelled from the University)." *Id.* at 3, 14 (BEAR Code §§ 3-2-203(2), 3-2-210(1)(a)–(c)).  "An appeal on one or more of the bases described above . . . will be reviewed by one or more appeal readers, who will be appointed by the Dean of Students." *Id.* at 14 (BEAR Code § 3-2-210(6)).  Finally, "[t]he appeal readers, after reviewing the record and the State of Appeal, will issue a written decision in which they may *affirm* or *reverse* the Resolution or may *remand the matter to the Dean of Students for further consideration*." *Id.* (BEAR Code §§ 3-2-210(7)) (emphasis added).

On September 15, 2021, Dean Sonnentag issued her Resolution, in which she found Mr. Williams "responsible for violating" BEAR Code section 3-2-204(8) ("Deadly

Weapons Violations").  ECF No. 28-1 at 3.  As summarized above, Dean Sonnentag then "assigned the following outcome(s) and restriction(s)": first, "University Suspension," "in effect starting [that day] September 15, 2021," by which Mr. Williams was "suspended through Spring 2022 and [could] be considered for re-enrollment beginning Summer 2022," if the additional requirements imposed on him were satisfactorily completed.  *Id.* at 3–4.  As part of the suspension, "a transcript hold" was placed on Mr. Williams' student account "until a notation stating 'Suspended for Conduct' [was put] in place."  *Id.* at 4. Second, Dean Sonnentag issued a "No Trespass Order, which prohibits [Mr. Williams'] presence on all [University] property/campuses."  *Id.* at 4.  Third, Dean Sonnentag required Mr. Williams to "complete a gun safety course."  *Id.* at 4.  Fourth and finally, Dean Sonnentag required Mr. Williams to "write a four- to five-page research paper on the following topic: Handgun Safety."  *Id.* at 4.  Dean Sonnentag advised Mr. Williams in the Resolution that he "ha[d] the right to appeal this decision through [the University's] written appeals process."  *Id.* at 5.

On September 19, 2021, Mr. Williams appealed Dean Sonnentag's September 15, 2021 Resolution, *see* ECF No. 30-2, and the appeal readers submitted their decision on appeal on October 7, 2021, *see* ECF No. 28-2 at 1.  In their decision, the appeal readers described their role as follows:

> As part of our role in the appeal process, appeal readers have the ability to reverse the Resolution, affirm the Resolution, or remand the matter to the Dean of Students for further consideration.  As a result of this responsibility, the purpose of our examination is to ensure that Dean of Students hearing officer has done their due diligence to both establish a fact pattern for the case and provide appropriate rationale, *in addition to ensuring that Outcome(s) are appropriate given give [sic] the nature of the policy violation*.

ECF No. 28-2 at 2 (emphasis added).  Upon reviewing Mr. Williams' case and the Dean's

Resolution, the appeal readers concluded that:

> After reviewing all materials for this case, we have concluded that the
> Outcome(s) are not appropriate given the nature of the Misconduct that was
> committed.

*Id.* at 1.  The appeal readers went on to set forth in detail the information upon which the

rationale for their finding was based.  *Id.* at 1–2.  They then set forth their finding regarding

the sanction imposed and their recommendations on remand:

> A review of all documentation and appeal proceedings demonstrates that
> there is sufficient evidence to support the finding that you did violate
> University Regulations as outlined in the Notification of Resolution (written
> decision letter).  However, we believe the sanction of Suspension was too
> severe.  *Therefore, in reflecting on the restrictions, conditions, and
> educational outcomes given, we like [sic] to remand the decision back to
> the Dean of Students with a recommendation that:*
>
> 1. *Formal Impact Meeting, hosted by Mr. Williams, with fellow students,
>    teammates, coaches, and community members in attendance.  This
>    meeting should allow time for Mr. Williams to discuss how this
>    incident impacted him, his family, his education, his teammates,
>    coaches, peers, and community members, and also allow time for
>    peers and community members to discuss the negative impact this
>    had on all parties.  Mr. Williams discussed in his appeal letter that he
>    felt he would be open and willing to providing a "Gun Safety
>    Campaign" in a space where a Q & A regarding this experience
>    would be welcome.  It is clear that Mr. Williams is a leader on
>    campus, in athletics, and in the [University] community, and we
>    believe that Mr. Williams can utilize the lessons learned from this
>    incident and teach others from this experience.  This meeting should
>    be 1-2 hours in length, with time allowed for impact statements from
>    the [University] community.  This meeting will occur prior to the
>    conclusion of the Fall 2021 semester.*

> 2. *Gun Storage and Safety essay, 2-3 pages in length, with a focus on safely storing your weapon when not in use.  In the documents submitted for sanction requirements, you submitted an essay that addressed many aspects of gun safety.  This appeal committee feels that there was not a sufficient focus on proper storing or inventory of firearms.  Write an essay with a focus on storage and safety of weapons and inventory checks.  Due within a reasonable timeframe to be determined by the Dean of Students office.*

*Id.* at 2–3 (emphasis in original).

After receiving the appeal readers' decision on October 7, 2021, Dean Sonnentag issued her decision on remand the following day, October 8, 2021.  *See* ECF Nos. 28-2, 28-3.  Dean Sonnentag upheld Mr. Williams' suspension, concluding that "[w]hile [she] appreciate[d] the efforts of the appeal readers," she "f[ou]nd that [they] did not provide sufficient support for the proposition that [Mr. Williams'] suspension was inappropriate." ECF No. 28-3 at 5.

Dean Sonnentag reasoned that "[a]lthough each case may have different facts, *maintaining fundamental fairness in the student conduct process is reliant upon consistency and equitable decision-making in cases involving similar behaviors.*"  *Id.* at 4.  She also stated that each of the five previous cases since July 1, 2017 in which a student was found responsible for weapons-related violations of the BEAR Code "resulted in suspension for no fewer than two semesters."  *Id.* at 4–5.  Dean Sonnentag went on to note that in both of the two cases out of five in which the student appealed the severity of the sanction of suspension, "the appeal readers affirmed that suspension was, in fact,

appropriate, given the nature and severity of these substantially similar violations."[4]  *Id.* at 5.   Therefore, Dean Sonnentag stated that she "reviewed the rationale and recommendations provided by the appeal readers, as well as the outcomes of substantially similar conduct cases since July 1, 2017 to determine whether the Outcomes [Mr. Williams] w[as] assigned were inappropriate given the nature of [his] Misconduct" and decided that the appeal readers' judgment regarding the severity of his sanction was incorrect.  *See id.* at 5.

However, at the Motion Hearing, Dean Sonnentag testified that the information regarding the "substantially similar conduct cases" upon which she relied in rejecting the appeal readers' conclusion was also available to the appeal readers during their review of her initial Resolution.  She also acknowledged this in her written decision on remand. *See id.* at 4 ("*As the appeal readers were aware*, there have been multiple incidents in which other students were found responsible for weapons-related violations of the Student Code of Conduct for unlawfully carrying, bringing, or being in possession of a firearm.") (emphasis added).

---

[4] Dean Sonnentag continued to compare Mr. Williams' case to the five previous weapons-related violations by noting that:

- In four of these cases, the Responding Party had no conduct violations prior to the case resulting in their suspension.
- In three of these cases, there was no stated intent to harm others.
- . . .
- One of these cases involved a student leaving their loaded firearms unsecured and unattended in a backpack on [University] Property.  The student in that case held a Colorado permit to carry a concealed firearm.

ECF No. 28-3 at 5.

Dean Sonnentag agreed with one of the appeal readers' recommendations—that Mr. Williams write an essay more focused on storage and safety of weapons and inventory checks—was "reasonable" and adopted it. *Id.* at 4–5. Hence, requiring Mr. Williams to submit a more focused essay, after he had already completed the "Handgun Safety" essay that was initially assigned, amounted to requiring Mr. Williams to complete a second essay, on top of maintaining his original suspension and other sanctions. This additional essay became the only change in the Outcomes that Dean Sonnentag had adopted in her initial Resolution following Mr. Williams' hearing. *See id.* at 5; ECF No. 28-2 at 3. As a result, on remand, Dean Sonnentag imposed a *harsher* sanction, after the appeal readers had found that "the sanction of Suspension was too severe." ECF No. 28-2 at 3.

This appeal process is inconsistent with basic principles of fairness and likely violates Mr. Williams' procedural due process rights because, as discussed below, first, it failed to follow the University's own established procedures, *see Morton v. Ruiz*, 415 U.S. 199, 235 (1974); and, second, it failed to provide Mr. Williams with a "meaningful opportunity to present [his] case" within the appeal procedures that the University chose to provide. *See Watson*, 242 F.3d at 1240 (quoting *Mathews*, 424 U.S. at 349); *see also Mathews*, 424 U.S. at 333.

i.      **The University Failed To Follow Its Own Procedures.**

The Supreme Court has held that "[w]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures."  *Ruiz*, 415 U.S. at 235.[5] Here, the University failed to follow its own procedures in several ways.

First, Dean Sonnentag's decision to reject the conclusions of the appeal readers is not supported by the appeal readers' interpretation of their role under the BEAR Code. Nowhere does the BEAR Code give Dean Sonnentag such absolute authority.  *See* ECF No. 30-5 *passim*.  Defendants argued at the Motion Hearing that because the BEAR Code does not explicitly provide that Dean Sonnentag *did not* have the authority to reject the appeal readers on remand, her rejection of the appeal readers' conclusions did not violate the appeals process established by the BEAR Code.  Not so.  The appeal readers' description of the "purpose of [their] examination" within their "role in the appeal process" established by the BEAR Code was "to ensure that [the] Dean of Students hearing officer has done their due diligence to both establish a fact pattern for the case and provide appropriate rationale, *in addition to ensuring that Outcome(s) are appropriate given the nature of the policy violation*."  ECF No. 28-2 at 2 (emphasis added).  The University officials' language describing their role in the process as "ensuring" the appropriateness

---

[5] "Even though *Ruiz* may well not have been a due process case," the Tenth Circuit has "nonetheless consider[ed] whether it bears on the due process right . . . because its basis is somewhat opaque."  *See Hobbs ex rel. Hobbs v. Zenderman*, 579 F.3d 1171, 1185 n.9 (10th Cir. 2009); *see also, e.g., Nichols v. Reno*, 931 F. Supp. 748, 751 (D. Colo. 1996) (reasoning that *Ruiz* is "premised on the fair play concept embodied in the principle that due process of law is required for government actions that affect the rights of individuals").  The Court finds the principle expressed in *Ruiz* to be pertinent and applicable to its determination of Mr. Williams' procedural due process rights here.

of the Outcome(s) chosen by the Dean, *see id.*, does not suggest that the conclusions of the appeal readers were open to rejection by the Dean.[6]

Second, the plain language of the BEAR Code does not compel the conclusion that when appeal readers "remand" a case, rather than "reversing" it, the Dean may reject the appeal readers' findings or conclusions.  Defendants argue that because the BEAR Code provides the appeal readers with three options to affirm, reverse, or remand, the fact that they chose to remand, rather than reverse, allows Dean Sonnentag to reject their conclusions.  ECF No. 30 at 8–10.  This argument does not follow.  It follows that the appeal readers chose not to "reverse" the decision of the Dean because they agreed with the Dean's finding that Misconduct took place under the "Deadly Weapons Violations" provision of the BEAR Code and only disagreed with the severity of the sanction.  .  *See* ECF No. 28-2 at 2.  Under the plain meaning of the term "reversal," the appeal readers would only have chosen that option if they had disagreed with the substantive decision that Misconduct took place and sought to overturn that decision, which they did not.  *See Reverse*, Merriam-Webster, https://www.merriam-webster.com/dictionary/reverse (last accessed Nov. 5, 2021) (defining "reverse" to mean "to set aside or make void (a judgment or decision) by a contrary decision"); *see also Reverse*, *Black's Law Dictionary* (11th ed. 2019) (defining "reverse" to mean "[t]o overturn (a judgment or ruling), esp. on appeal").

---

[6] The Supreme Court has held that 42 U.S.C. § 1983 "does not extend the right to relitigate in federal court . . . the proper construction of school regulations."  *Wood v. Strickland*, 420 U.S. 308, 326 (1975).  However, here, the Court does not impose its own interpretation of the BEAR Code; rather, the Court applies the appeal readers' own interpretation of their role under the BEAR Code to conclude that it was outside of Dean Sonnentag's authority to reject the appeal readers' conclusions on remand.

Third, a plain reading of the appeal readers' decision compels the conclusion that the Dean was free to consider the appeal readers' *recommendations* but was not free to re-consider the appeal readers' *conclusions*.  The appeal readers explicitly "concluded that the Outcome(s) are not appropriate given the nature of the Misconduct that was committed."  ECF No. 28-2 at 1.  They then went on to make a "recommendation" about the *lesser* sanctions that the Dean could choose to impose, instead.  *See id.* at 2–3.  Thus, it was clear from the appeal readers' decision that on remand, the Dean was to consider the appeal readers' recommended sanctions and fashion a new outcome that was *less severe* than the one she originally imposed.  *See id.*  Instead, as discussed above, she *increased* the severity of the sanction by maintaining the suspension and, in effect, assigning a second essay.  *See id.* at 4–5; ECF No. 28-3 at 4–5.  This decision on remand contradicted the appeal readers' conclusion that the sanction was too severe, contravening their own interpretation of their role under the BEAR Code as "ensuring that Outcome(s) are appropriate given the nature of the policy violation."  *See* ECF No. 28-2 at 2.  The University failed to "follow [its] own procedures," as was "incumbent upon" it here, "[w]here the rights of [Mr. Williams] [we]re affected."  *Ruiz*, 415 U.S. at 235.

Finally, Defendants argue that Mr. Williams received more process than was due because under *Goss*, all that was required was a notice and a hearing, so by providing an appeals process, the University provided a process that exceeded what Mr. Williams was due under the Fourteenth Amendment.  ECF No. 30 at 6–8.  However, when the Supreme Court held in *Ruiz* that "it is incumbent upon agencies to follow their own procedures," it continued that "[t]his is so even where the internal procedures are possibly

more rigorous than otherwise would be required."  415 U.S. at 235.  The BEAR Code provides for an appeal process; but here, as discussed above, the findings of the appeal readers were rejected on remand.  Rejecting the findings of the appeal readers rendered the University's "own procedures" for appeals that it chose to establish a nullity.  *Ruiz*, 415 U.S. at 235.

Defendants' citation to *Tonkovich v. Kansas Board of Regents* that "a university's failure to follow its established guidelines in overseeing a grievance does not in and of itself implicate constitutional due process concerns" is equally unavailing.  ECF No. 30 at 6 (quoting *Tonkovich v. Kan. Bd. Regents*, 159 F.3d 504, 522 (10th Cir. 1998)).  The Tenth Circuit's conclusion in *Tonkovich* that the university's violation of its own procedures established for a particular evidentiary hearing did not violate due process was tied to the specific due process protections accorded by federal courts to "a tenured public employee."  159 F.3d at 517.

Here, the school's procedures that Mr. Williams seeks to enforce are formally established in the BEAR Code to apply to all disciplinary proceedings, not one-off evidentiary rules established for a particular hearing.  In contrast to *Tonkovich*, where the employee had the opportunity to review the summaries of statements prior to his hearing and cross-examine witnesses, the question here is whether the Dean's failure to adhere to the findings of the appeal readers deprived Mr. Williams of his procedural due process.  Mr. Williams was afforded the opportunity to present his appeal to the appeal readers.  The appeal readers found the sanction imposed by the Dean was too harsh.  The Dean disagreed with the appeal readers on remand and imposed the same, if not an arguably

harsher, sanction. The Dean's rejection of the appeal readers' findings merely expounded on the basis for her original decision, which was nothing more than a "do-over" of her previous rationale. This does not comport with either the letter or spirit of the appeal process. Consistent with *Tonkovich*, in evaluating the process that is due, the post-termination (or discipline) proceedings must be considered when determining whether Mr. Williams was afforded the process he was due. *See* 159 F.3d at 526–27.

Moreover, here, Mr. Williams is not a professor accused of sexual misconduct, but instead, a student facing a suspension of more than ten days. As the Tenth Circuit noted in *Tonkovich*, the federal courts "are responsible for establishing the contours of the Due Process Clause of the Fourteenth Amendment," *see id.* at 522, and the Supreme Court has explicitly left open the possibility that a suspension of a student for longer than 10 days "may require more formal procedures," *see Goss*, 419 U.S. at 584. While the Court expresses no opinion regarding whether a school must provide a student facing a lengthy suspension with an appeal process in order to comply with Fourteenth Amendment procedural due process requirements, the Court does find that if a school voluntarily chooses to provide such an appeal process, "it is incumbent upon [the school] to follow [its] own procedures, . . . even where the internal procedures are possibly more rigorous than otherwise would be required." *See Ruiz*, 415 U.S. at 235. Mr. Williams has established a substantial likelihood that he will prevail in his fifth claim for relief.

ii.      **Having Chosen To Provide an Appeal Process, the University Failed To Give Mr. Williams a Meaningful Opportunity To Make Use of That Process.**

While "due process does not require the 'wholesale transplantation' of the judicial rules of procedure to administrative hearings," the "'ultimate balance involves a determination as to when under our constitutional system, judicial-type procedures must be imposed upon administrative action to assure fairness." *Watson*, 242 F.3d at 1241 nn.2, 4 (quoting *Mathews*, 424 U.S. at 348).  In the context of federal courts, the "mandate rule" is "[a]n 'important corollary' to the law of the case doctrine" and requires "that a district court must comply strictly with the mandate rendered by the reviewing court." *Huffman v. Saul Holdings Ltd. P'ship*, 262 F.3d 1128, 1132 (10th Cir. 2001).  The mandate rule also "appl[ies] to judicial review of administrative decisions, and require[s] the administrative agency, on remand from a court, to conform its further proceedings in the case to the principles set forth in the judicial decision, unless there is a compelling reason to depart."[7]  *Grigsby v. Barnhart*, 294 F.3d 1215, 1218 (10th Cir. 2002) (internal quotation omitted); *see also Sullivan v. Hudson*, 490 U.S. 877, 886 (1989) ("Deviation from the court's remand order in the subsequent administrative proceedings is itself legal error, subject to reversal on further judicial review.").

---

[7]      [The Tenth Circuit] has . . . summarized the grounds for departure from both the law of the case and the mandate rule. . . .   With regard to the mandate rule, a deviation requires "exceptional circumstances," including (1) a dramatic change in controlling legal authority; (2) significant new evidence that was not earlier obtainable through due diligence but has since come to light; or (3) if blatant error from the prior . . . decision would result in serious injustice if uncorrected.

*Grigsby*, 294 F.3d at 1219 n.4 (quoting *Huffman*, 262 F.3d at 1133).

The Court does not suggest a "wholesale transplantation" of the mandate rule to the University's student disciplinary proceedings here.  *See Watson*, 242 F.3d at 1241 n.4 (quoting *Mathews*, 424 U.S. at 348).  However, the mandate rule, combined with the text of the appeal readers' decision, informs the Court's evaluation of whether Mr. Williams received a "meaningful opportunity" to make use of the appeal process that the University chose to establish.  *See Watson*, 242 F.3d at 1240 (quoting *Mathews*, 424 U.S. at 349) ("'All that is necessary' to satisfy due process 'is that the procedures be tailored, in light of the decision to be made, to the capacities and circumstances of those who are to be heard, to insure that they are given a meaningful opportunity to present their case."); *Mathews*, 424 U.S. at 333 (quoting *Armstrong*, 380 U.S. at 552) ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'").

Under the *Mathews* three-part balancing test, as adopted and applied to school disciplinary hearings in *Watson*, the Court finds that "to assure fairness" here, the University's disciplinary review system likely requires a more "judicial-type procedure[]" than the one it followed in Mr. Williams' case—specifically, where the appeal readers make certain findings and conclusions and separately provide specific "recommendations" about how to implement their decision, the findings and conclusions

should not be subject to total rejection on remand.[8]  *See Watson*, 242 F.3d at 1241 nn.2, 4.  The first factor in the *Mathews* balancing test is the "private interest that will be affected by the official action."  *See id.* at 1240.  Here, that private interest is Mr. Williams' interest in his continued and uninterrupted education in his institution of choice.  Second, the "probable value of the additional procedural safeguard" that is likely necessary here would be high.  *See id*.  Having an appeal process that is not subject to arbitrary rejection of the appellate body's findings on remand would better provide for a "meaningful opportunity" for Mr. Williams to be heard within the structures of the University's disciplinary appeal procedures.  *See id.*; *Mathews*, 424 U.S. at 333.  Finally, the "government's interest, including fiscal and administrative burden, that the additional or substitute procedural requirements would entail" are minimal here.  *See Watson*, 242 F.3d at 1240.  Requiring the University to adhere to the findings and conclusions resulting from an appeal system that is already in place would require no additional resources, either fiscal or

---

[8] At the Motion Hearing, Defendants argued that even lower courts can reinstate their original ruling on remand from a higher court, and so similar procedures should be acceptable in the school disciplinary context.  Defendants pointed to the example of *State of Washington v. Arlene's Flowers, Inc.*, in which the Colorado Supreme Court upheld its original decision after the United States Supreme Court remanded the case "in light of" its recent decision, *Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*, 138 S. Ct. 1719 (2018).  *Compare State v. Arlene's Flowers, Inc.*, 389 P.3d 543, 568 (Wash. 2017) (holding that "refusing . . . commercially marketed wedding floral services to [a couple] because theirs would be a same-sex wedding[] constitutes sexual orientation discrimination under [the Washington Law Against Discrimination]"), *with State v. Arlene's Flowers, Inc.*, 441 P.3d 1203, 1237 (Wash. 2019) (same).

*Arlene's Flowers* is inapposite because, there, in a two-sentence opinion that did not discuss, analyze, or opine on the merits or facts of the case, the Supreme Court simply vacated the judgment and "remanded to the Supreme Court of Washington for further consideration in light of *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 584 U.S. ---- (2018)."  *Arlene's Flowers, Inc. v. Washington*, 138 S. Ct. 2671, 2671–72 (2018).  That case is not similar to the situation here because, here, there was no analogous intervening change to the BEAR Code or other rules that gave rise to the appeal readers' remand.  *See* ECF No. 28-2 at 1–3.  Instead, the appeal readers analyzed the merits and the facts of Mr. Williams' case and the severity of his sanction by "review[ing] . . . all documentation and appeal proceedings" and then concluded the sanction was too severe.  *See id.* at 2.

administrative.  It would simply require the University to follow more faithfully the process it already chose to establish.

Given the factors set forth in the *Mathews* balancing test, the Court finds that Mr. Williams has a substantial likelihood of success on the merits of his procedural due process claim because the University's appeal procedure that it chose to establish, as implemented here, did not provide him with a meaningful opportunity to present his case. To the extent that the University rejected the findings and conclusions of the appeal readers on remand, there is a substantial likelihood that it violated Mr. Williams' procedural due process rights.

### 2.    Substantive Due Process

#### a.    Applicable Law

A federal court will "uphold a school's decision to suspend a student in the face of a substantive due process challenge if the decision is not arbitrary, lacking a rational basis, or shocking to the conscience of federal judges." *Butler*, 341 F.3d at 1200–01; *see also Yeasin v. Durham*, 719 F. App'x 844, 852 (10th Cir. 2018) ("[A] student must prove that the university's decision to expel her was arbitrary, lacked a rational basis, or shocks the conscience."). In *Tonkovich*, the Tenth Circuit acknowledged that while "[t]here is some indication that the 'shocks the conscience' standard and the 'arbitrariness' standard are used interchangeably," that Court "express[ed] no opinion on whether the 'shocks the conscience' standard applies," as opposed to "simply inquir[ing] whether the defendants' actions were arbitrary or lacking a rational basis."  159 F.3d at 529.  In *Butler v. Rio Rancho Public Schools Board of Education*, the Tenth Circuit again noted that it

"questioned in *Tonkovich* whether the 'shocks the conscience' standard applies to all due process violations" but did "not decide the issue" in *Butler* "because [it] conclude[d] the School's conduct d[id] not violate the due process clause under any of the standards." 341 F.3d at 1201 n.4.[9]

### b.    Discussion

Here, the Dean's decision on remand was arbitrary and therefore violated Mr. Williams' substantive due process rights.   The Dean's reasoning for her decision on remand was arbitrary.   She relied on five student conduct cases that had taken place since July 1, 2017 that she characterized as "substantially similar . . . where students were found responsible for deadly weapons-related violations involving loaded firearms." ECF No. 28-3 at 4.   She stated as support for her decision on remand that two out of those five cases were appealed and "[i]n each of those appeals, the appeal readers affirmed that suspension was, in fact, appropriate, given the nature and severity of these substantially similar violations." *Id.* at 5.   However, those cases are clearly distinguishable because in Mr. Williams' case, the appeal readers determined that the outcome of the two-semester suspension was "not appropriate given the nature of the Misconduct that was committed."   ECF No. 28-2 at 1.   Given that the appeal readers remanded Mr. Williams' case, rather than affirming the suspension, as they did in the prior cases, it

---

[9] Defendants cite the 1995 Tenth Circuit case *Uhlrig v. Harder* for the proposition that the standard for evaluating substantive due process claims is "whether the challenged government action would 'shock the conscience' of federal judges."  64 F.3d 567, 573 (10th Cir. 1995); *see also* ECF No. 30 at 11.   However, in *Tonkovich* and *Butler*—decided in 1998 and 2003, respectively—the Tenth Circuit more recently cast doubt on "whether the 'shocks the conscience' standard applies to all due process violations."  *See Butler*, 341 F.3d at 1201 n.4; *see also Tonkovich*, 159 F.3d at 529.

follows that Mr. Williams' case did not involve "substantially similar" behaviors as the prior cases, and Dean Sonnentag's decision to the contrary was arbitrary.

Indeed, one example of a previously appealed student conduct case that Defendants admitted as Exhibit 12 at the Motion Hearing confirms that at least one of those cases was substantially different from Mr. Williams' case.  There, the student was found responsible for violating three (not one) of the provisions of the BEAR Code; the student left two firearms and three knives unattended in their room, with the door propped open; the student stated that they did not feel there was a problem with leaving weapons concealed or in a secure location; and the student asked the Assistant Dean of Students why he was being treated like a terrorist if he did not pose a threat.  Differences between Mr. Williams' case and the prior cases contravene the Dean's own stated purpose of "maintaining fundamental fairness in the student conduct process," which she stated is "reliant upon consistency and equitable decision-making in cases involving substantially similar behaviors."  ECF No. 28-3 at 4.

The differences between Mr. Williams' case and the prior cases that Dean Sonnentag reviewed on remand underscore that Dean Sonnentag's decision to reject the appeal readers' decision on remand was arbitrary.  Indeed, Dean Sonnentag testified at the Motion Hearing that the same information regarding these prior misconduct cases that was available to her on remand was also available to the appeal readers when they made their decision.  Therefore, rejecting the appeal readers' decision on remand based on the same information that they had amounted to nothing more than substituting their judgment and conclusions with her own.

Further, the Dean's decision on remand, which rejects the appeal readers' findings that her sanction was too harsh, is arbitrary and capricious in light of the clear and plain language of the appeal readers' decision.  Dr. Sonnentag's own Declaration is illuminating in this regard.  According to Dr. Sonnentag, the appeal readers affirmed her finding that Mr. Williams was responsible for a "Deadly Weapons Violation[]" under section 3-2-204(8) of the BEAR Code, and the "matter was remanded to [the Dean] for further consideration of the appeal readers' recommendations."  ECF No. 30-1 ¶ 8.  Dr. Sonnentag's conclusion that her decision was affirmed regarding the finding of misconduct, but remanded only for consideration of the appeal readers' "recommendations" regarding the sanction, is unsupported.  The plain language of the appeal readers' decision clearly sets forth the finding that the Dean's sanction was too severe—tantamount to a reversal of that sanction—and sets forth the rationale for this finding.  The appeal readers remanded the sanction issue to the Dean to consider alternative, less severe sanctions.  The appeal readers provided recommended sanctions that would address the compelling need of the institution but also impose a less harsh sanction, consistent with the findings of the appeal readers.  To read the appeal readers' decision as allowing the Dean to simply restate her conclusions and re-impose the same (or an even harsher) sanction, as the Dean argues she is entitled to do, obviates the appeal right afforded to Mr. Williams under the BEAR Code.  This reading allows the original decisionmaker to exercise naked and arbitrary power in disciplinary decisions and likely violates Mr. Williams' Fourteenth Amendment substantive due process right.

**B.    Irreparable Harm**

After establishing that there is a "substantial likelihood of success on the merits" of his claims, a movant for a preliminary injunction must also show that he will suffer "irreparable harm . . . if the injunction is denied."  *See Aposhian*, 958 F.3d at 978.  The "irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages."  *Schrier v. Univ. Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005) (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003)).

Defendants argue that Mr. Williams will not suffer irreparable harm because, first, he has been suspended, rather than expelled, and can therefore re-enroll in the Summer of 2022.  ECF No. 30 at 13.  Second, Defendants argue that Mr. Williams can take courses from another school while his suspension from the University is in effect.  *Id.* at 13–14.  Third, according to Defendants, Mr. Williams would not have made progress toward his master's degree during the fall semester of 2021, in any case, because Mr. Williams enrolled in undergraduate courses during that semester in order to focus on football.  *Id.* at 14.  These arguments ignore the fact that Mr. Williams will have lost at least the spring semester of educational opportunities to work toward a master's degree in his chosen field of clinical mental health counseling at his chosen school—a semester he will not be able to get back.  *See, e.g.*, *Doe v. Pa. State Univ.*, 276 F. Supp. 3d 300, 315 (M.D. Pa. 2017) (finding that a gap of two years from a joint program between the university and a medical college "would constitute irreparable harm as he would forever be forced to explain his lengthy tenure within this program and, ultimately, his delayed entry into the

professional workforce"); *King v. DePauw Univ.*, No. 2:14-cv-70-WTL-DKL, 2014 WL 4197507, at *13 (S.D. Ind. Aug. 22, 2014) (finding that the plaintiff would suffer irreparable harm where "even if, as DePauw asserts, he could choose to attend another university and ultimately graduate on time[,] he will forever have either a gap or a senior-year transfer on his record"). Further, regardless of which classes Mr. Williams chose,[10] Mr. Williams is in the process of losing, and in effect has already lost, his fall semester of educational opportunities.

Furthermore, Mr. Williams testified at the Motion Hearing that he will likely suffer harm when seeking educational or professional opportunities by having a notation on his transcript indicating that he was suspended. The Court admitted as Exhibit 1 at the Motion Hearing the parties' list of stipulated facts, in which they stipulate that "[w]hile Mr. Williams's transcript will state 'suspended for conduct', if he returns to the University the transcript will be updated to state 'reinstated in good standing.'" However, Mr. Williams testified that even if the notation on his transcript were to later be amended to "reinstated in good standing," he would have to explain the reason for such a notation to future prospective employers or educators. *See, e.g.*, *Doe v. Middlebury Coll.*, No. 1:15-cv-192-jgm, 2015 WL 5488109, at *3 (D. Vt. Sept. 16, 2015) (finding that the plaintiff would suffer irreparable harm where he "would have to explain, for the remainder of his professional life, why his education either ceased prior to completion or contains a gap"); *see also*

---

[10] Mr. Williams testified at the Motion Hearing that he chose to enroll in undergraduate psychology courses during his fall semester because he believed that they would help prepare him for his chosen field of mental health counseling, given that he received his undergraduate degree in sociology. *See* ECF No. 30-3 ¶ 9 (noting that Mr. Williams enrolled in undergraduate communications, psychology, and theater courses during his fall semester).

*King*, 2014 WL 4197507, at *13; *cf. Goss*, 419 U.S. at 575 ("If sustained and recorded, those charges [of misconduct] could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment.").  "Money damages cannot provide an adequate remedy for such imminent and non-speculative harm."  *Doe*, 2015 WL 5488109, at *3; *see also King*, 2014 WL 4197507, at *13 ("Money damages would not provide an adequate reedy at that point.").  Defendants' repeated suggestion at the Motion Hearing that such a delay in Mr. Williams' education, combined with a notation on his transcript of either "Suspended for Conduct," *see* ECF No. 28-1 at 4, or "reinstated in good standing," is a mere "inconvenience" is callous, at best.  Perhaps the court in *Goss* summed it up best in its consideration of a lesser sanction than the one at bar:

> A short suspension is, of course, a far milder deprivation than expulsion. But, "education is perhaps the most important function of state and local governments," . . . and the total exclusion from the educational process for more than a trivial period, and certainly if the suspension is for 10 days, is a serious event in the life of the suspended child.  Neither the property interest in educational benefits temporarily denied nor the liberty interest in reputation, which is also implicated, is so insubstantial that suspensions may constitutionally be imposed by any procedure the school chooses, no matter how arbitrary.

419 U.S. at 577 (quoting *Brown v. Bd. Educ.*, 347 U.S. 483, 493 (1954)).  Mr. Williams has demonstrated that he will be irreparably harmed absent the requested relief.

### C.    Balance of the Harms

"To obtain a preliminary injunction, the movant must [also] show [that] . . . the threatened injury outweighs the harms that the preliminary injunction may cause the opposing party."  *Aposhian*, 958 F.3d at 978.  Defendants argue that "the University has

an interest in 'discipline and order,'" ECF No. 30 at 15 (quoting *Goss*, 419 U.S. at 579), and that "[t]here is no doubt that the School has a legitimate interest in providing a safe environment for students and staff," *id.* (quoting *Butler*, 341 F.3d at 1201).   However, Defendants' interests in discipline, order, and safety are not harmed by the Court's decision here.   "The Due Process Clause will not shield [this student] from suspensions properly imposed, but it disserves both his interest and the interest of the [University] if his suspension is in fact unwarranted."   *See Goss*, 419 U.S. at 579.   Here, the school's own appeals process found the sanction to be too harsh.   Allowing a student, who the appeal readers "do not believe . . . poses any further risk to fellow students, staff, faculty, or the [University] community" and who, in fact, they recognized as a "leader on campus, in athletics, and in the [University] community," ECF No. 28-2 at 2–3, to return to campus poses no risk to the safe environment of the students or staff.

On the other hand, Mr. Williams will likely suffer irreparable harm if he is unable to return to school, as discussed above.   *See supra* Section III.B.   Mr. Williams' interest in receiving a fair and meaningful disciplinary procedure that is consistent with the procedures the University chose to establish outweighs the harm that Defendants will face should Mr. Williams return to campus, which, as discussed above, is minimal or non-existent.   The Court finds that Mr. Williams' "threatened injury . . . outweighs whatever damage the proposed injunction may cause the opposing party," *Heideman*, 348 F.3d at 1188, and the balance of the harms at stake tips in Mr. Williams' favor.

### D.    Public Interest

The final requirement for a movant to obtain a preliminary injunction is to show that "the injunction, if issued, will not adversely affect the public interest."  *Aposhian*, 958 F.3d at 978.  Defendants argue that "the broader public interest in gun safety extends beyond the significant interests held here by the University."  ECF No. 30 at 15.  The Court recognizes the grave and serious public interest in gun safety to both the University and the broader public.  However, it is also in the public interest to require the University to follow its own procedures that it has established to handle student disciplinary proceedings.  The Supreme Court in *Goss* noted that suspension can be "a valuable educational device," 419 U.S. at 580, and emphasized that "education is perhaps the most important function of state and local governments," *id.* at 576 (quoting *Brown*, 347 U.S. at 493).  The Supreme Court has further noted that education "is the very foundation of good citizenship."  *Brown*, 347 U.S. at 493.  The procedures that a school establishes in order to determine when to wield the "valuable educational device" of suspension can be equally as valuable in promoting the public interest of teaching the "foundation of good citizenship" through the example of a fair and meaningful process.  If a public educational institution puts a certain procedure in place for handling disciplinary issues but fails to follow it, this would not advance the public interest of exemplifying the fair and meaningful process that is guaranteed to students under the Fourteenth Amendment of the Constitution.

Again, this is not a question of whether the University is entitled to enforce its BEAR Code or whether the University can and should protect its students and faculty from

dangerous weapons.  Rather, the issue here is whether the Dean must abide by *the institution's own* interpretation and finding regarding the appropriateness of the sanction imposed.  This Court believes the answer to this question must be yes.  The failure to do so under the circumstances here is arbitrary and capricious and fails to accord the Mr. Williams the process he was due.  Mr. Williams has demonstrated that granting the TRO would not be adverse to the public interest.

## IV.    CONCLUSION

For the reasons stated above, the Court GRANTS IN PART Plaintiff's Second Motion for Temporary Restraining Order and Preliminary Injunction, ECF No. 29, and DENIES Defendant's oral motion for the Court to consider that Plaintiff has not met his burden under Federal Rule of Civil Procedure 65 to demonstrate his entitlement to the extraordinary remedy of a preliminary injunction, *see* ECF No. 32.

As to Plaintiff's Second Motion for Temporary Restraining Order and Preliminary Injunction, ECF No. 29, the Court GRANTS IN PART the motion, to the extent that it requests the Court to enjoin Defendants from enforcing Dean Sonnentag's October 8, 2021 decision on remand, pending the issuance of a new resolution on remand of the appeal readers' decision.[11]  The appeal readers' decision is ordered remanded to Dean Sonnentag to allow the Dean to impose a less severe sanction consistent with the findings of this Court and the appeal readers' determination that the original sanction imposed by the Dean was too harsh.  In particular, the Dean must consider:

---

[11] *See* ECF No. 28-2 at 3 (appeal readers' decision, noting that "the original outcomes are in effect until you receive an updated resolution letter").

- The rationale of the appeal readers in finding the previous sanction to be too harsh;

- The fact that Mr. Williams has already been suspended for most of the fall semester; and

- The alternative recommendations for sanction suggested by the appeal readers.

The Dean's decision on remand shall be issued no later than Friday, November 12, 2021 at 5:00 p.m. Mountain Time.  No later than 5:00 p.m. Mountain Time on Monday, November 15, 2021, Defendants shall file with the Court a certification that the Dean's decision on remand was timely issued to Mr. Williams.

DATED:  November 9, 2021

BY THE COURT:

_____
REGINA M. RODRIGUEZ
United States District Judge

36